118 P.3d 203 (2005)
2005-NMCA-110
Jane DOE, by and through her parents and next friend, J.H., Plaintiff-Appellee,
v.
SANTA CLARA PUEBLO, Santa Clara Development Corporation, d/b/a Big Rock Casino Bowl, Defendants-Appellants, and
Steven Bird, Miguel Ortigoza, Timothy Ortigoza, and Emily Ortigoza, Defendants.
No. 25,125.
Court of Appeals of New Mexico.
June 28, 2005.
Certiorari Granted August 12, 2005.
As Corrected September 7, 2005.
*204 Merit Bennett, Merit Bennett, P.C., Santa Fe, NM, for Appellee.
Richard W. Hughes, Sean J. Flynn, Rothstein, Donatelli, Hughes, Dahlstrom & Schoenburg, LLP, Santa Fe, NM, for Appellants.
Certiorari Granted, No. 29,350, August 12, 2005.

OPINION
VIGIL, Judge.
{1} This case requires us to decide whether a New Mexico state court has subject matter jurisdiction of a personal injury suit *205 brought against Santa Clara Pueblo as a result of events occurring at a casino owned and operated by Santa Clara Pueblo on its land. The district court denied the Pueblo's motion to dismiss for lack of subject matter jurisdiction. Upon consideration of the effect of the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701 to 2721 (1988, as amended through 1997), we affirm.

BACKGROUND

Facts and Proceedings
{2} Jane Doe, a fourteen-year-old girl, by and through her parents and next friend, J.H. (jointly referred to as Plaintiff), sued the Santa Clara Pueblo, a federally recognized Indian tribe, and Santa Clara Development Corporation, a corporation wholly owned by the Pueblo that operates the Big Rock Casino Bowl (the Casino) on tribal land within the Santa Clara grant. We refer to Santa Clara Pueblo and the Santa Clara Development Corporation together as "Santa Clara."
{3} Plaintiff alleges that she was visiting the Casino with her mother and grandmother; that she was kidnapped in the Casino parking lot by three males; that she was taken to a car parked in the Casino parking lot and driven away; that she was then repeatedly assaulted, battered, and raped by her abductors; and that they then dumped her near her home in Española, New Mexico. Plaintiff alleges Santa Clara is liable because the Casino failed to provide adequate security and lighting in the parking lot, and failed to aid in locating Jane Doe when it was apparent she was missing from the premises, all of which proximately caused damages. The district court denied Santa Clara's motion to dismiss for lack of subject matter jurisdiction, but certified its decision for an interlocutory appeal, and we granted Santa Clara's application for an interlocutory appeal. An order denying a motion to dismiss for lack of subject matter jurisdiction involves a question of law which we review de novo. Gallegos v. Pueblo of Tesuque, 2002-NMSC-012, ¶ 6, 132 N.M. 207, 46 P.3d 668.
{4} The district court denied Santa Clara's motion to dismiss based on its determination that, pursuant to a valid tribal-state compact, the IGRA permits state courts to assume subject matter jurisdiction over personal injury suits arising on the premises of a tribal gaming facility located on tribal land. On appeal, Santa Clara argues that the district court improperly denied its motion to dismiss because, absent a grant of jurisdiction from the United States Congress, state courts are powerless to hear cases that arise on tribal land. Santa Clara further contends that the IGRA does not constitute such a grant of jurisdiction. Additionally, Santa Clara argues that the IGRA does not allow a state and a tribe to enter into a compact that shifts jurisdiction over personal injury claims to state courts. Plaintiff concedes that state court jurisdiction over her claim must derive from the IGRA, but she contends that the New Mexico state district court has subject matter jurisdiction of her claim because a tribal-state compact validly shifts jurisdiction from tribal court to state court.

Pertinent Provisions of Law and Compact
{5} The IGRA is "a comprehensive regulatory framework for gaming activities on Indian lands which . . . established the framework under which Indian tribes and states could negotiate compacts permitting [high-stakes] gaming on Indian reservations located within state territory." Gallegos, 2002-NMSC-012, ¶ 9, 132 N.M. 207, 46 P.3d 668 (internal quotation marks, footnote, and citation omitted). The IGRA divides tribal gaming into three categories. Social and traditional games comprise the first category, known as Class I gaming. 25 U.S.C. § 2703(6). Class II gaming consists of bingo, pull-tabs and certain card games. § 2703(7). The third category, Class III gaming, includes all games which are not Class I or II gaming. § 2703(8). Class III gaming includes blackjack and slot machines, id., and is commonly known as "high-stakes" gaming. Gallegos, 2002-NMSC-012, ¶ 9 n. 1, 132 N.M. 207, 46 P.3d 668. In order to offer Class III games in New Mexico, the IGRA requires tribes, including Santa Clara, to enter into a compact with the State of New Mexico governing gaming activities on the tribe's land. See 25 U.S.C. § 2710(d)(1)(C). The State of New Mexico and Santa Clara negotiated a compact (the Compact) under the Compact Negotiation Act, NMSA 1978, §§ 11-13A-1 *206 to -5 (1999), which the state legislature approved in 2001. See S.J. Res. 37, 45th Leg., 1st Sess. (N.M.2001); see also NMSA 1978, § 11-13-1 (1997 and 2004 Supp. compiler's note). Pursuant to the IGRA, the Secretary of the Interior approved the Compact between the State and Santa Clara on December 14, 2001. See Indian Gaming, 66 Fed.Reg. 64,856 (Dec. 14, 2001) (notice of Secretary of the Interior approval of compacts between New Mexico and, among others, Santa Clara); see also 25 U.S.C. § 2710(d)(3)(B).
{6} The Compact acknowledges that the "safety and protection of visitors to a Gaming Facility is a priority of" Santa Clara and that one of the purposes of the Compact is "to assure that any such persons who suffer bodily injury or property damage proximately caused by the conduct of the Gaming Enterprise have an effective remedy for obtaining fair and just compensation." Therefore, Santa Clara "waives its defense of sovereign immunity in connection with any claims for compensatory damages for bodily injury or property damage up to the amount of fifty million dollars ($50,000,000) per occurrence asserted," and "agrees to proceed either in binding arbitration proceedings or in a court of competent jurisdiction, at the visitor's election, with respect to claims for bodily injury or property damage proximately caused by the conduct of the Gaming Enterprise." The Compact further states that "any such claim may be brought in state district court, including claims arising on tribal land, unless it is finally determined by a state or federal court that IGRA does not permit the shifting of jurisdiction over visitors' personal injury suits to state court."
{7} As a general rule, "[e]xclusive tribal jurisdiction exists . . . when an Indian is being sued by a non-Indian over an occurrence or transaction arising in Indian country." Found. Reserve Ins. Co. v. Garcia, 105 N.M. 514, 516, 734 P.2d 754, 756 (1987) (citations omitted); see Tempest Recovery Servs., Inc. v. Belone, 2003-NMSC-019, ¶ 14, 134 N.M. 133, 74 P.3d 67. However, Congress may confer jurisdiction over such a suit on a state court. Williams v. Lee, 358 U.S. 217, 223, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959); see South Dakota v. Yankton Sioux Tribe, 522 U.S. 329, 343, 118 S.Ct. 789, 139 L.Ed.2d 773 (1998) (noting that "Congress possesses plenary power over Indian affairs, including the power to modify or eliminate tribal rights").
{8} We note that Congress has granted jurisdiction over civil and criminal matters involving reservation Indians to any state that is willing to accept it provided that the assumption of jurisdiction is approved by the affected tribe. 25 U.S.C. §§ 1322(a), 1324 (1968); see also McClanahan v. State Tax Comm'n, 411 U.S. 164, 177-78, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973). However, New Mexico has not elected to assume jurisdiction over tribal lands. Your Food Stores, Inc. v. Vill. of Espanola, 68 N.M. 327, 332, 361 P.2d 950, 954 (1961); see Chino v. Chino, 90 N.M. 203, 206, 561 P.2d 476, 479 (1977); see also New Mexico Enabling Act, ch. 310, § 2, 36 Stat. 557, 559 (1910) (stating that New Mexico has disclaimed jurisdiction over Indians and Indian land); N.M. Const. art. XXI, § 2 (same). Therefore, if New Mexico courts have subject matter jurisdiction in this case it must derive from the IGRA.
{9} The IGRA sets out the provisions that may be included in a compact negotiated to facilitate Class III gaming activities. 25 U.S.C. § 2710(d). In pertinent part, a tribal-state compact may include provisions relating to:
(i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity; [and]
(ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations[.]
25 U.S.C. § 2710(d)(3)(C). Based on these provisions, Santa Clara argues that New Mexico's state courts lack jurisdiction to hear Plaintiff's claims because her "personal injury claims have nothing to do with the `licensing or regulation' of [C]lass III gaming activities." We disagree.
{10} Pursuant to the IGRA and the Compact Negotiation Act, New Mexico and Santa Clara entered negotiations to form a *207 compact to permit Santa Clara to offer Class III gaming on its tribal land. The Compact that emerged from their "good faith negotiations" devotes an entire section to defining the mechanism by which visitors may be compensated for their injuries. In particular, the Compact expressly allows visitors to bring their claims in state court. Because the State and Santa Clara negotiated and agreed to address remedies for visitor injuries in the Compact, it is apparent that both parties themselves determined that apportioning jurisdiction over the claims of injured visitors was "directly related to, and necessary for, the licensing and regulation of [Class III gaming] activity." See §§ 2710(d)(3)(C)(i), (ii). The legislative history of the IGRA demonstrates that Congress intended the scope of each tribal-state gaming compact to be determined by the parties in the course of their negotiations as equal sovereigns. We therefore conclude that it is not the province of this Court to second-guess that determination.

Legislative History of the IGRA
{11} The dispute over Indian gaming began when the Seminole Tribe of Florida opened its first bingo hall in 1979. S.Rep. No. 100-446, at 2 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3072; see Seminole Tribe v. Butterworth, 658 F.2d 310, 311-12 (5th Cir.1981). Following Seminole Tribe, Indian gaming continued to be a contentious issue between tribes and states. See, e.g., Iowa Tribe v. Kansas, 787 F.2d 1434, 1435-36 (10th Cir.1986) (involving dispute between state and tribe over the sale of pull-tabs on the tribe's reservation); Lac du Flambeau Band v. Williquette, 629 F.Supp. 689, 691 (W.D.Wis.1986) (same); Penobscot Nation v. Stilphen, 461 A.2d 478, 480 (Me.1983) (involving dispute between state and tribe over the enforcement of state bingo laws on the tribe's reservation). Many states attempted to assert jurisdiction over gaming on tribal land because of concerns over the potential for gaming to attract criminal elements. S.Rep. No. 100-446, at 2, 5. However, tribes strongly resisted these efforts based on their sovereign right to self-government and the threat such efforts posed to the significant economic benefits that gaming was conferring on their members. Id. at 2-3; see 134 Cong. Rec. 25,376 (1988) (statement of Ariz. Rep. Morris Udall) (noting that the "basic problem . . . has been the conflict between the right of tribal self-government and the desire for [s]tate jurisdiction over gaming activity on Indian lands").
{12} Congress began to consider a resolution to the tribal-state conflict over gaming as early as 1983. See 129 Cong. Rec. 34,184 (1983) (statement of Ariz. Rep. Morris Udall). However, it was not until the Supreme Court's decision in California v. Cabazon Band of Mission Indians, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987) [hereinafter Cabazon], that Congress was able to work out a compromise between state and tribal interests. S.Rep. No. 100-446, at 4. In Cabazon, the Cabazon Band of Mission Indians argued that a California law regulating bingo could not be enforced on tribal land. 480 U.S. at 206, 107 S.Ct. 1083. The Supreme Court agreed with the tribe and held that California could not enforce its bingo laws on the tribe's reservation. Id. at 211-12, 107 S.Ct. 1083. The Cabazon decision was issued six days after the bill that would become the IGRA was introduced; nevertheless, the Cabazon case persuaded many tribes that legislation on the subject was inevitable and that reaching a compromise with the states might yield legislation that was more solicitous of tribal interests. See S.Rep. No. 100-446, at 4.
{13} The IGRA became law on October 17, 1988. See Indian Gaming Regulatory Act, Pub.L. No. 100-497, 102 Stat. 2467, 2467 (1988) (codified, as amended, at 25 U.S.C. §§ 2701 to 2721). The legislative history leading to its passage clearly reveals that the IGRA was an effort by Congress to reach a compromise between the states and the tribes. See, e.g., 134 Cong. Rec. 25,377 (1988) (statement of Ariz. Rep. Morris Udall, chair of the Committee on Interior and Insular Affairs) (stating that the IGRA "is a delicately balanced compromise"); 134 Cong. Rec. S12643, S12650 (daily ed. Sept. 15, 1988) (statement of Haw. Sen. Daniel Inouye, chair of the Select Committee on Indian Affairs) (noting that the IGRA "is not the best of all possible worlds" but it is a workable *208 solution to a contentious issue). Many states argued that they should be given complete jurisdiction over gaming on tribal land. See 134 Cong. Rec. at 25,377 (statement of Nev. Rep. Barbara Vucanovich). Supporters of state jurisdiction noted that the "[s]tates . . . have the sovereign right  and the responsibility  to protect their citizens from the threat of criminal activity" that may accompany high-stakes gambling. 134 Cong. Rec. at 25,378 (statement of Cal. Rep. Anthony Coelho); see id. at 25,381 (statement of Nev. Rep. James Bilbray) (noting that the "[s]tates have a constitutional responsibility to protect their citizens from harm, here in the form of . . . victimization by criminal elements that may infiltrate the legal games operated on Indian lands"). Opponents of the IGRA were troubled by the bill's intrusion on Indian sovereignty. See S.Rep. No. 100-446, at 13; see also 134 Cong. Rec. at 25,379 (statement of Minn. Rep. Gerald Sikorski); 134 Cong. Rec. at S12656-57 (statement of S.D. Sen. Tom Daschle).
{14} Ultimately, Congress adopted a flexible solution that allowed competing state and tribal interests to be balanced on a case-by-case basis. See S.Rep. No. 100-446, at 6 (noting that in crafting the IGRA "the [Indian Affairs] Committee has attempted to balance the need for sound enforcement of gaming laws and regulations, with the strong Federal interest in preserving the sovereign rights of tribal governments to regulate activities and enforce laws on Indian land"); see also 134 Cong. Rec. at 25,378 (Cal. Rep. Anthony Coehlo) (noting that the IGRA "establishes a framework in which Indian tribes and [s]tates can meet as equals, government-to-government, to negotiate an agreement  a compact  for a mutually acceptable method of regulating high-stakes gambling on Indian reservations"). Under the IGRA, each tribe that wishes to engage in Class III gaming must enter into a compact with the affected state. See 25 U.S.C. § 2710(d)(1)(C). However, no state may acquire any additional jurisdiction over tribal lands under the IGRA "unless a tribe affirmatively elects to have [s]tate laws and [s]tate jurisdiction extend to tribal lands." S.Rep. No. 100-446, at 6.
{15} A consistent theme emerges from the legislative history: Congress recognized the gravity of the tribal-state conflict but chose not to impose a universal, nationwide solution. Instead, Congress created a mechanism by which each tribe and each state could negotiate over how to apportion jurisdiction over tribal gaming. See S.Rep. No. 100-446, at 13 (noting "that the use of compacts between tribes and states is the best mechanism to assure that the interests of both sovereign entities are met with respect to the regulation of complex gaming enterprises"). The resulting tribal-state "compact may allocate most or all of the jurisdictional responsibility to the tribe, to the State or to any variation in between." S.Rep. No. 100-446, at 14; see Gallegos, 2002-NMSC-012, ¶ 10, 132 N.M. 207, 46 P.3d 668 (noting that "according to Congress, a state court may exercise jurisdiction over a tribe pursuant to the IGRA when a tribe and a state have consented to such an arrangement in a gaming compact"). The language of the IGRA is consistent with this theme. See id. (noting that "the language of the IGRA allows the states and the tribes to negotiate with respect to jurisdiction"). The Act provides very general guidance on what issues a tribal-state compact may address and leaves the scope of each compact to be determined by the states and the tribes. See 25 U.S.C. § 2710(d); 134 Cong. Rec. at S12651 (statement of Haw. Sen. Daniel Inouye) (noting that "the idea [behind the compact approach] is to create a consensual agreement between the two sovereign governments and it is up to those entities to determine what provisions will be in the compacts"); see id. (statement of Wash. Sen. Daniel Evans) (noting that Congress "intend[s] that the two sovereigns  the tribes and the [s]tates  will sit down together in negotiations on equal terms and come up with a recommended methodology for regulating [C]lass III gaming on Indian lands"); see also S.Rep. No. 100-446, at 14 (noting that 25 U.S.C. § 2710(d)(3)(C) lists the "broad areas" that may be addressed in a tribal-state compact).

Permissibility of Shifting Jurisdiction for Personal Injuries
{16} Our review of the legislative history reveals that Congress intended that *209 states and tribes resolve the details of regulating tribal gaming. In the present case, the State of New Mexico and Santa Clara negotiated a compact that allowed Santa Clara to open the Casino. The State and Santa Clara negotiated the Compact as equal sovereigns. We find no evidence, nor does Santa Clara point us to any evidence, that suggests that the Compact was not fairly formed or that the State did not negotiate in good faith. See 25 U.S.C. § 2710(d)(3)(A) (requiring that states negotiate tribal-state compacts in good faith). To the contrary, the Compact expressly notes that it is the product of "good faith negotiations recognizing and respecting the interests of each party." Further, we note that the Secretary of the Interior reviewed and approved the Compact shortly after it was formed. See Indian Gaming, 66 Fed.Reg. 64,856 (Dec. 14, 2001). Therefore, we consider the Compact to fairly represent a valid agreement between the State and Santa Clara. As a result, we conclude that this dispute must be resolved by resort to the terms of the Compact.
{17} The Compact demonstrates the State and Santa Clara's concern for the safety of visitors to the Casino and their belief that the redress of the Casino's visitors' injuries was "directly related to, and necessary for, the licensing and regulation of [Class III gaming] activity." 25 U.S.C. § 2710(d)(3)(C)(i). We are aware of the concerns expressed during the debate over the IGRA regarding the pretextual use of tribal-state compacts by states to impose broad state jurisdiction over tribal lands. See S.Rep. No. 100-446, at 14 (noting that a tribal-state compact is not intended to "be used as a subterfuge for imposing [s]tate jurisdiction on tribal lands"); see also 134 Cong. Rec. at 25,378 (statement of Cal. Rep. Anthony Coelho) (noting that it is not "the intent of Congress that [s]tates use negotiations on gaming compacts as a means to pressure Indian tribes to cede rights in any other area"). Therefore, we do not exclude the possibility that there may be circumstances in which a state and a tribe include compact provisions that plainly exceed the authority granted by Congress in the IGRA. But that is not the case here. Redressing injuries sustained by the Casino's visitors is sufficiently related to the regulation of tribal gaming enterprises that we have no difficulty concluding that the State and Santa Clara acted within the scope of the IGRA when they formed the Compact. Under these circumstances, it is not the province of this Court to second-guess the conclusion of New Mexico and Santa Clara that personal injuries sustained by Casino patrons due to the allegedly negligent operation of the Casino are "directly related" to the regulation of Class III gaming.
{18} We also note that if we were to accept Santa Clara's narrow reading of the IGRA, much of the Compact would be invalid. The Compact contains provisions concerning the serving of alcoholic beverages, labor conditions, employment discrimination, and liability insurance. Reading the IGRA so narrowly as to exclude these provisions is not consistent with the legislative intent underlying the IGRA. Congress gave the states and tribes broad discretion to resolve their competing interests regarding tribal gaming. As a result, when two equal sovereigns conclude, pursuant to the IGRA and with the Secretary of the Interior's concurrence, that alcoholic beverages, labor conditions, and visitor safety are directly related to the regulation of a Class III gaming enterprise, we afford substantial weight to that conclusion. We decline to strike down an agreement reached between the Pueblo and the State where the IGRA does not bar jurisdiction-shifting by its own terms, the IGRA seems to allow a tribe and state broad discretion in arriving at mutually acceptable terms in a compact related to Class III gaming, and the IGRA's history confirms that such shifting was contemplated.

CONCLUSION
{19} The State and Santa Clara agreed in the course of negotiations as equal sovereigns that issues regarding the safety of the Casino's visitors are directly related to gaming. This conclusion is entirely consistent with the IGRA and its legislative history. Therefore, we affirm the district court's denial of Santa Clara's motion to dismiss for lack of subject matter jurisdiction.
{20} IT IS SO ORDERED.
*210 I CONCUR: CYNTHIA A. FRY, Judge.
JONATHAN B. SUTIN, Judge (dissenting).
SUTIN, Judge (dissenting).
{21} I respectfully dissent. In regard to visitors' personal injury actions arising out of negligent conduct on the premises of tribal casinos, the IGRA does not grant states an option to exercise jurisdiction or grant states and tribes a license to shift jurisdiction from tribe to state. The district court, therefore, did not have subject matter jurisdiction of Plaintiff's personal injury action against Santa Clara.
{22} The IGRA is "a comprehensive regulatory framework for gaming activities on Indian lands which . . . established the framework under which Indian tribes and states could negotiate compacts permitting Class III gaming on Indian reservations located within state territory." Gallegos v. Pueblo of Tesuque, 2002-NMSC-012, ¶ 9, 132 N.M. 207, 46 P.3d 668 (internal quotation marks and citation omitted). In order to engage in Class III gaming operations, Santa Clara was required to enter into a compact with the State of New Mexico (the Compact). See 25 U.S.C. § 2710(d)(1) (1988). The compact in question was negotiated in 2000 under the Compact Negotiation Act, NMSA 1978, §§ 11-13A-1 to -5 (1999), and became effective in 2001. See NMSA 1978, § 11-13-1 (1997, and 2004 Supp. compiler's note); see also 66 Fed.Reg. 64856-01 (Dec. 14, 2001) (notice of Secretary of the Interior approval of compacts between New Mexico and, among others, Santa Clara).
{23} Under the Compact, Santa Clara waived its sovereign immunity for personal injury claims filed by visitors to the Casino. It also agreed that New Mexico law would apply to such personal injury claims. However, the Compact left unsettled in which court such claims could be pursued. Obviously intended to permit Santa Clara to test jurisdiction shifting, Section 8(A) of the Compact states that "any such claim [for bodily injury] may be brought in state district court, including claims arising on tribal land, unless it is finally determined by a state or federal court that IGRA does not permit the shifting of jurisdiction over visitors' personal injury suits to state court."
{24} Unless changed by "governing Acts of Congress," tribal courts retain exclusive jurisdiction over claims arising on tribal lands against tribes, including tribal entities and tribal members. Williams v. Lee, 358 U.S. 217, 220, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959). Through Public Law 83-280, Act of August 15, 1953, ch. 505, §§ 6, 7, 67 Stat. 590, Congress granted jurisdiction over civil and criminal matters involving reservation Indians to the states that were willing to accept it. See Williams, 358 U.S. at 222, 79 S.Ct. 269; Your Food Stores, Inc. v. Vill. of Espanola, 68 N.M. 327, 332, 361 P.2d 950, 954 (1961). New Mexico did not elect to assume jurisdiction over tribal lands. Id. New Mexico courts have recognized that "[e]xclusive tribal jurisdiction exists . . . when an Indian is being sued by a non-Indian over an occurrence or transaction arising in Indian country." Found. Reserve Ins. Co. v. Garcia, 105 N.M. 514, 516, 734 P.2d 754, 756 (1987) (citations omitted); see Tempest Recovery Servs., Inc. v. Belone, 2003-NMSC-019, ¶ 14, 134 N.M. 133, 74 P.3d 67. Plaintiff acknowledges "that without . . . Congressional authority, state courts lack the power to entertain lawsuits against tribal entities." If New Mexico courts have subject matter jurisdiction in this case, the jurisdictional authority must derive from the IGRA.
{25} Section 2710(d)(3)(C) sets out the provisions that may be included in a negotiated compact that are pertinent to the issue before us. Section 2710(d)(3)(C) permits compact provisions relating to:
(i) the application of the criminal and civil laws and regulations of the Indian tribe or the [s]tate that are directly related to, and necessary for, the licensing and regulation of such activity;
(ii) the allocation of criminal and civil jurisdiction between the [s]tate and the Indian tribe necessary for the enforcement of such laws and regulations[.]
{26} Section 2710(d)(3)(C)(ii) plainly permits an allocation of jurisdiction only as necessary for the enforcement of laws and regulations that are directly related to and *211 necessary for licensing and regulation of Class III gaming activities. In the IGRA, including § 2710(d)(3)(C)(ii), there exists no express inclusion of, nor any indication of a discernable legislative intent to include, jurisdiction allocation or shifting in relation to a negligence claim such as Plaintiff's. The duty underlying Plaintiff's claims does not come within the scope of jurisdiction necessary for the enforcement of laws and regulations that are directly related to and necessary for licensing and regulation of Class III gaming activities.
{27} Section 8 of the Compact pertains specifically to the protection of visitors to the Casino. Part (A) states a policy that the safety and protection of visitors is a priority, with the assurance that visitors with personal injury claims will have an effective remedy for obtaining fair and just compensation. The policy provision in Part (A) also contains the language at issue in this case regarding jurisdiction. Having an effective remedy does not necessarily require state court jurisdiction. Nothing in the record indicates that a visitor claimant cannot have an effective remedy through tribal court or arbitration as long as those processes provide due process. Part (C) of Section 8 is a limitations provision that appears to pertain to any claim that might be brought relating to the subjects in Section 8. Part (E) permits the visitor claimant to elect between a court of competent jurisdiction or arbitration, and Part (F) deals solely with arbitration. Parts (B) and (G) facilitate the policy in (A) by requiring Santa Clara to carry liability insurance. Part (D) facilitates effective relief through a limited waiver by Santa Clara of sovereign immunity and through an agreement that New Mexico law will apply. Part (H) is preventative in nature, requiring Santa Clara to conform to certain health, safety, and construction standards.
{28} As indicated earlier, the pertinent language in Section 8(A) of the Compact is: a claim for bodily injury "may be brought in state district court . . . unless it is finally determined by a state or federal court that IGRA does not permit the shifting of jurisdiction over visitors' personal injury suits to state court." Thus, among the several aspects of the safety and protection purposes of Section 8, Part (A) permits a visitor to bring a personal injury claim in state court, but if the state court in that case or perhaps in another case determines that the IGRA does not permit the tribe to shift jurisdiction over such visitor personal injury suits to state court, then the visitor's personal injury claim in state court fails for lack of jurisdiction. The parties to the Compact expected the issue to be litigated.
{29} Section 8 uses "state court jurisdiction" in only one place, and that is in the clause quoted above. Elsewhere, the section uses, simply, "court" and "a court of competent jurisdiction." These latter uses of "court" can mean, and I suspect the uses were intended to mean, (1) tribal court and (2) state court if a court determines that the IGRA permits jurisdiction shifting over visitors' personal injury suits. The question then reverts, of course, to whether the IGRA permits jurisdiction shifting from tribal court to state district court over Plaintiff's personal injury claims.
{30} The sole provision in the IGRA that is applicable, § 2710(d)(3)(C)(i, ii), is permissive and limited. Read in conjunction with (d)(3)(A) it provides: any compact governing the conduct of gaming activities may include provisions relating to the allocation of civil jurisdiction necessary for the enforcement of civil laws that are directly related to, and necessary for, the licensing and regulation of the conduct of gaming activity. See § 2710(d)(3)(A), (C)(i, ii). These IGRA provisions do not explicitly permit the parties in compacts to agree to the shifting of jurisdiction over visitors' personal injury suits from tribal court to state court. Congress could have worded the section in a way that obviously or necessarily included personal injury negligence claims by visitors. It did not do so.
{31} It is reasonable to conclude that Congress intended in the IGRA to distinguish between a tribe's governmental role and a tribe's commercial enterprise role. In its governmental role, Santa Clara engages in licensing and regulation, the sole subjects of § 2710(d)(3)(C). In its role of conducting commercial operations, Santa Clara has *212 agreed that the safety and protection of its visitors is a priority and has agreed to a limited waiver of its sovereign immunity for visitors' claims for bodily injury. The subject of the tribe's limited immunity waiver is nowhere to be found in § 2710(d)(3)(C).
{32} Gallegos, 2002-NMSC-012, 132 N.M. 207, 46 P.3d 668, does not change the playing field. In Gallegos, the issue in the present case was not addressed. The question in Gallegos was whether the court had subject matter jurisdiction of a tort claim against the tribe, and that issue was dependent on whether, under the doctrine of tribal sovereign immunity, the tribe was immune from suit in state court. Id. ¶¶ 6-7. Gallegos states that "[a] tribe can . . . waive its own immunity by unequivocally expressing such a waiver." Id. ¶ 7. Gallegos also states that "[w]ithout an unequivocal and express waiver of sovereign immunity or congressional authorization, state courts lack the power to entertain lawsuits against tribal entities." Id. Our Supreme Court raised congressional authorization in regard to jurisdiction, citing § 2710(d)(3)(C)(ii). Gallegos, 2002-NMSC-012, ¶ 10, 132 N.M. 207, 46 P.3d 668. However, the Court stopped short, expressly stating that, while the issue of jurisdiction shifting was argued, the Court was not going to address it. Id. ¶ 10 n. 3.
{33} Rather, the Court in Gallegos addressed only the question whether the tribe waived its tribal immunity from suit in state court. Id. ¶ 11. In doing so, the Court addressed the tort claimant's argument that the tribe had signed and was bound by a compact containing Section 8, and then held that the claimant could not rely on the compact because it was not in effect. Id. ¶¶ 12-14. Gallegos was aware of the jurisdiction-shifting issue and refused to consider it because of its holding that the compact on which the claimant relied was not effective. Thus, Gallegos does not read § 2710(d)(3)(C)(i, ii) to state that the IGRA expressly permits the question of state court jurisdiction over visitors' personal injury suits to be a topic of negotiation in compacts. Gallegos contains no discussion of what the words in that section mean or cover, or were intended to mean or cover. Gallegos contains no discussion of whether language in a congressional authorization of state court jurisdiction must be expressly or explicitly stated in the legislation, as opposed to implied from wording in legislation.
{34} Barring Gallegos, the majority opinion is left with legislative history. What is significant about that discussion is the absence of any comment in congressional hearings regarding whether the IGRA was to permit an allocation of jurisdiction beyond that necessary for the enforcement of laws and regulations directly related to and necessary for licensing and regulation of Class III gaming activities. In the IGRA, including § 2710(d)(3)(C)(ii), there exists no express inclusion of, nor any indication of a discernible legislative intent to include, jurisdiction allocation or shifting in relation to a negligence claim such as Plaintiff's. The duty underlying a visitor's personal injury claim does not come within the scope of jurisdiction necessary for the enforcement of laws and regulations that are directly related to and necessary for licensing and regulation of Class III gaming activities.
{35} In sum, no express authority granted by Congress through the IGRA exists for a state to exercise jurisdiction over visitors' personal injury actions arising out of negligent conduct on the premises of tribal casinos. The IGRA's compact requirement for Class III gaming is not an express grant of authority to states to exercise such subject matter jurisdiction. Section 8 of the 2001 New Mexico/Santa Clara Compact cannot bootstrap Plaintiff's claims as coming within the scope of § 2710(d)(3)(C)(i, ii). Nor can the Compact circumvent the Williams rule of exclusive tribal jurisdiction over general tort actions arisiing on Indian land except pursuant to an express congressinal grant of jurisdictional authority.